IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CARLA TILLISON,** | : | **CIVIL NO. 1:CV-06-2004** |
| **Plaintiff,** | : | **JUDGE SYLVIA H. RAMBO** |
| **v.** | : | |
| **CAPITOL BUS COMPANY, d/b/a CAPITOL TRAILWAYS INC.,** | : | |
| **Defendant.** | : | |

## M E M O R A N D U M

This case arises in an employment context. Plaintiff Carla Tillison sues her former employer, Capitol Bus Company, d/b/a Capitol Trailways Inc. ("Capitol"), alleging that she was subjected to a racially and sexually hostile work environment and constructively discharged in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA"). Before the court is Defendant's motion for summary judgment on all claims. For the reasons that follow, the motion will be granted in part and denied in part.

I.        **Background**

A.        **Facts**

Viewed in the light most favorable to Plaintiffs, the facts are as follows.

1.        **Capitol Trailways**

Capitol is a bus company with its offices, garages, and a shop located in Harrisburg, Pennsylvania. (Robert "Skip" Becker Dep. 12, 52, June 6, 2007.) Capitol employs about 100 people, including about a dozen mechanics and cleaners who work the third shift overnight. (*Id.* 12.) The company is owned by three

individuals: Joshua Bennett, Joseph Wrabel, and H. Robert "Skip" Becker.  (*Id.* 9.)
In 2003, Bennett was the President of Capitol and Becker was the Vice President of
Human Resources.  (*Id.*)  Brian Boughter was the Director of Maintenance for all
shop employees.  (Brian Boughter Dep. 11, June 20, 2007.)  William "Bill" Long
was the third shift supervisor.  He worked directly under Boughter.  (William Long
Dep. 21, April 25, 2007; Boughter Dep. 19.)

### 2.   Non-Discrimination Policies

At the time Tillison was employed by Capitol, the company had three
company policies concerning workplace behavior: the Sexual Harassment Policy,
the Equal Employment Opportunity Policy, and the work rules for the shop.

The Sexual Harassment Policy provided as follows:

> Any employee, regardless of gender, who has a complaint of sexual
> harassment at work, concerning anyone—including supervisors, co-
> workers, or visitors—must bring that complaint to the attention of the
> Vice President of Human Resources.  In the event that Vice President is
> a responsible party to a sexual harassment complaint, the problem
> should be addressed to the President of the company.  The company
> will not tolerate any form of sexual harassment.
>
> *  *  *
> Where a complaint exists, employees are encouraged to take full and
> reasonable advantage of any preventive or corrective opportunities
> provided by the company.

(Tillison Dep. Ex.3.)

The Equal Employment Opportunity Policy provided as follows:

> Capitol Bus Company does not tolerate discrimination or sexual
> harassment of any nature by its managers or employees.  If you believe
> you have been the subject of discrimination or sexual harassment, you
> should immediately bring the matter to the Company's attention.  You
> may discuss the matter with any member of management, including the
> owners.  No employee shall be subject to retaliation.  This open door
> policy is in addition to the rights you have under the labor contract if
> you are a member of the bargaining unit, and rights you have under
> federal, state and city laws.

(*Id.* Ex. 2.)  The work rules for the shop, provided as follows:

> Capitol Bus Company does not tolerate discrimination or harassment of any nature by its manager or employers.  If you believe you have been the subject of discrimination or harassment, you should immediately bring the matter to the company's attention.  You may discuss the matter with any member of management, including the owners.

(*Id.* Ex. 4.)

When new employees are hired, they are asked to sign and review the documents.  However, employees are not given a copy of either the Sexual Harassment or the Equal Employment Opportunity Policy to keep.  Instead, the policies are stored in each employee's personnel file, which is kept in a locked file drawer in the office of the Vice President of Human Relations.  (Boughter Dep. 58.)  In order to see the policies stored in the personnel file, an employee must make a written request to the Vice President of Human Resources to see the file.  (*Id.* 58.)  Additionally, the administrative offices are closed and locked during the third shift.  (Becker Dep. 26.)  On the other hand, shop employees are permitted to keep a copy of the shop rules, and another copy is stored in a three ring binder in the break room.  (Boughter Dep. 59-62.)

Capitol provided no formal sexual harassment or non-discrimination training to any of its supervisory employees.  (Becker Dep. 48.)  According to Becker the issue was occasionally mentioned in informal safety meetings, but no specific training was provided because "we've never recognized a need, so it's not then something that we have responded to under any other circumstance."  (Becker Dep. 49:5-7.)

**3.**     <u>**Plaintiff's Employment at Capitol**</u>

In September 2003, Capitol hired Tillison as a bus cleaner on the third shift at the Harrisburg terminal.  (Tillison Dep. 32-33, May 2, 2007.)  On the day she was hired, Boughter asked Plaintiff to review and sign a number of employment forms, including the Sexual Harassment Policy, the Equal Employment Opportunity Policy, and the work rules for the shop.  Altogether, Boughter spent 20-25 minutes reviewing approximately 20 forms with Plaintiff.  (Boughter Dep. 22.)  Although Boughter does not specifically remember explaining the Sexual Harassment policy to Plaintiff, he says that he developed a routine by which he would "explain it to them in layman's terms." (Boughter Dep. 51:20-23.)  "I explained it so they understood it, . . . [a] form, you know, always has a bunch of words that a lot of times people don't understand in layman's terms." (*Id.* 52:12-16.)  "I usually had them laughing when I'd explain the forms, you know.  So they understand, you know, so it sinks in." (*Id.* 52:19-22.)  According to Plaintiff, Boughter did not explain the policies to her, but just asked her to sign them.  (Tillison Dep. 31.)  Plaintiff complied with Boughter's request, and the signed copies of the Sexual Harassment and Equal Employment Opportunity policies were placed in Plaintiff's employment file which is stored in a locked filing cabinet in Becker's office, which is located in Capitol's administrative offices.  (Boughter Dep. 58.)  It was Tillison's understanding that it was Capitol's policy that sexual harassment should be reported to management.  (Tillison Dep. 33-34, 37.)

Plaintiff worked the third shift from 11 p.m. until 7:00 a.m., under the immediate supervision of Bill Long.  (Tillison Dep. 29; Long Dep. 57-58.)  As Director of Maintenance, Boughter supervised the work of both Plaintiff and Long.

(Boughter Dep. 11.)  Boughter typically worked from 5 or 6 a.m. until 1 to 5 p.m., and he remained on call at all times.  (*Id.*)  Plaintiff worked as a house cleaner, and it was her job to clean the interior of the buses.  (Long Dep. 28.)  There was a high turnover of employees working the third shift, but there were typically about a dozen at any time.  (*Id.* 43.)  During the time Plaintiff worked at Capitol, there were only two other women on the third shift, Nancy Hale, a white woman in her mid-50's and Rochelle Richardson, an older African-American woman.  (*Id.* 40, 42.)

        Although the shop rules prohibit it, vulgar language "was all around.  It was in the garage, in the break room, pretty much everywhere."  (*Id.* 86:17-19.)  As Long explained, "There's a lot of stuff said in the lunchroom when they're in there, I mean because you're dealing with ex cons and there's a lot of things that are . . . you know, they use a lot of vulgar language.  Try not to in front of women, but it happens in there."  (*Id.* 79:21-80:3.)  Language included words such as "fuck" (*id.* 80), "cunt" (*id.*), and "tits" (*id.*).  Employees also talked about having sex.  (*Id.* 80; Tillison Dep. 102.)  As Long explained, "it's general conversation" in the lunchroom at Capitol.  (Long Dep. 81:3-5.)  Long contributed to the vulgar discussion.  For instance, he discussed visiting strip clubs with another employee, Vinny Ammons, in the lunchroom while Plaintiff was present.  "[H]e used to pay me to look at buses for him, so we'd go down south and stuff and we'd stop at the strip clubs on the way, you know, and we'd talk about, you know, the strippers in the bar and stuff."  (*Id.* 114:13-19.)

        By all accounts, the language was worse in the shop and on the night shift.  (Becker Dep. 49-50.)  Long would not want his wife or daughters "to hear what goes on or what's said at Capitol Trailways garage."  (Long Dep. 86:4-6.)  "It's

different because there's a different group of people at work.  I mean, it's not like me talking to my wife or my wife talking to me or me talking to my daughter.  It's nothing like that.  That's what makes it different.  I wouldn't do that in front of my wife or daughter." (*Id.* 85:7-14.)  Long believed it would be disrespectful to use such language in front of his wife and daughter.  (*Id.* 85.)

Additionally, Bill Long addressed comments directly to Tillison.  Long asked her what perfume she was wearing and told her she smelled good.  (Tillison Dep. 53-54; Long Dep. 111-12.)  According to Tillison, Long would make sexual comments to her every night.  (Tillison Dep. 113.)  Long would often say things when he was alone with her.  (*Id.* 62.)  He also asked her about her underwear—whether she wore a thong and what color her panties were.  (*Id.* 54.)  Long denies asking Plaintiff about her "panties," insisting that he used the term "underwear" instead.  (Long Dep. 109-10.)  More than once, "he used to say, 'I'll be watching you cleaning the bus.  He said, I'll be watching you.  Your titties look so good.  I can't even hardly do my work from keeping an eye on you.' " (Tillison Dep. 61:6-9.)

Long also viewed pornography on the computer in his office during lunch breaks.  (Long Dep. 95.)  The office had a large window facing the parking lot where Tillison worked.  His computer screen faced the window, and workers could see what was on the computer at night.  (*Id.* 99).  No one from Capitol management ever talked to him about that habit, although Boughter was aware of it.  (*Id.* 102.)  Once, Long asked Plaintiff to look at something in his office.  When Tillison entered the office, she saw a video of two naked women wrestling on the computer screen.

(Tillison Dep. 108-109.)  She told Long he was crazy and left.  Long also displayed a calender of naked and bikini-clad women in his office.  (Long Dep. 109.)

Tillison also claims that Long made offensive racial comments to her. According to Tillison, when she asked Long whether he liked black women, he replied, " 'tell you the truth, if I could have every flavor of nationalities I would.' " (Tillison Dep. 66:1-4.)  Tillison asked Long because she knew that he liked her and wanted to have sex with her.  (*Id.* 66.)

According to Tillison, the harassment began shortly after she started work at Capitol, and persisted "from the time I started until the time I quit." (Tillison Dep. 53, 111:9-12.)  One morning at the end of a shift, Tillison was standing outside the office waiting to clock out when another employee and Long commented on Tillison's appearance, saying "ain't she pretty, man?"  (*Id.* 64.)

> "And I was like, ya'll some perverts.  I said, you know what, I'm going to go in there—I said, I'm going to go in there and tell.  Those are my words.  And I put my head towards the office.  Bill said, oh, if you go in there, they ain't going to do nothing but laugh at you.  They ain't going to do nothing if you go in there and tell them we're sexually harassing you, they ain't going to do nothing."

(*Id.* 64:20-65:4.)  Long denies telling Tillison not to make a complaint.  (Long Dep. 116.)  However, he says that if she had made a complaint, he would have laughed, because he would have thought it was a joke.  (*Id.* 123.)

According to Skip Becker, notifying Long of the harassment would not have constituted a complaint, because Long was the offending party.  (Becker Dep. 108.)  Nor would a verbal complaint of harassment have been sufficient.  "I don't know if you could just jump in an investigation based on what somebody said. . . If there are charges of that magnitude being made against the company, it should be a matter of a written statement."  (*Id.* 62:1-10.)

On June 4, 2004, Plaintiff did not report to work her assigned shift. The next night, she called the shop and Sam Bacon, a co-worker and union representative answered the phone. (Tillison Dep. 73.) Plaintiff told him that she was not coming in to work that night, or ever again. When he asked why, she said that she was being sexually harassed. (*Id.*) A few days later, Plaintiff received a call from Boughter asking her why she did not come to work, and asking her to return. (*Id.* 74.) Apparently, Bacon did not immediately tell Boughter that Tillison was resigning due to sexual harassment.

A few days after Boughter spoke with Plaintiff by phone, he sent her a letter, drafted with Becker's assistance, that stated in pertinent part:

> On June 4, 2004, you were a no call/no show for your regular work assignment. Ms. Tillison, this is in violation of our agreed to work rules and or contract with the Amalgamated Transit Union 1195. This is an offense whereby you can and will be terminated.
>
> Ms. Tillison, it is my understanding that on June the 5th you called in on the shop phone and spoke with Sam Bacon, a Union Representative and an employee of Capitol Trailways, in the shop. At this time, you informed him that you were quitting Capitol Trailways effective immediately.
>
> Ms. Tillison, we accept your verbal resignation and wish you the best of luck in whatever your new endeavors are. However, if you should rescind this verbal termination within the next ten (10) day (sic), the disciplinary action for the no call/no show will remain standing.

(Boughter Letter, June 7, 2004.)

At some point, Boughter learned that Plaintiff resigned due to sexual harassment. (Boughter Dep. 37.) Boughter asked Long if Plaintiff was harassed, and Long denied it. (*Id.*) As Boughter explained, "Bill's been with the company many, many years you know. He's my right-hand man. What am I going to do?" (*Id.* 42.) Boughter did not contact Plaintiff after learning that she complained of

8

sexual harassment.  (*Id.* 38.)  Ultimately, Boughter reported to Becker and Capitol's owners that he had heard that Plaintiff had resigned due to sexual harassment. (*Id.* 36, 38, 40.)  According to Becker, Capitol regarded Plaintiff's allegation as a complaint.  (Becker Dep. 67.)  However, neither Boughter nor any other member of management made any further investigation after learning that Plaintiff resigned due to sexual harassment.  (Boughter Dep. 40.)  In his deposition, Becker stated that he does not know what an investigation of sexual harassment would look like because Capitol has never done one.  (Becker Dep. 42.)  Long was never disciplined by Capitol for sexually harassing Plaintiff.  (*Id.* 79.)

### B.      Procedural History

Plaintiff filed a complaint against Defendant on October 11, 2006, alleging a violation of Title VII and the PHRA.  (Doc. 1.)  On July 10, 2007, Defendants filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Doc. 17.)  A brief in support thereof was filed the same day.  (Doc. 18.)  Plaintiff filed a brief in response on August 1, 2007.  (Doc. 23.)  A reply brief was filed on August 16, 2007.  (Doc. 25.)  Thus, the matter is ripe for disposition.

## II.      Legal Standard

_____"In an employment discrimination case, the burden of persuasion on summary judgment remains unalterably with the employer as movant.  The employer must persuade [the court] that even if all of the inferences which could reasonably be drawn from the evidentiary materials of record were viewed in the light most favorable to the plaintiff, no reasonable jury could find in the plaintiff's favor." *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358 (3d Cir. 2008).  Summary judgment

is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  *Id.* at 248.  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted).  Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial."  *Celotex*, 477 U.S. at 322-23.  "'Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the

evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III.        Discussion

Defendant argues that it is entitled to summary judgment because (1) the incidents and comments which form the basis for Plaintiff's hostile environment sex and race discrimination claims were not sufficiently severe or pervasive to constitute hostile environment discrimination, and (2) Plaintiff unreasonably failed to utilize Defendant's nondiscrimination policy.  These arguments will be addressed in turn.

### A.        Hostile Environment Discrimination

"In order to state a claim under Title VII for discrimination resulting from a hostile work environment, an employee must show that (1) the employee suffered intentional discrimination because of [her] sex, (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected the [employee], (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and (5) the existence of respondeat superior liability." *Andreoli v. Gates*, 482 F.3d 641, 643 (3d Cir. 2007) (*citing Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001)).  The analysis is the same for claims of race discrimination under Title VII, *see West v. Phila. Elec. Co.*, 45 F.3d 744, 753 n.7 (3d Cir. 1995), and for claims of hostile environment discrimination under the PHRA, *see Weston*, 251 F.3d at 425 n.3.  Defendant argues that the alleged harassment suffered by Plaintiff was not sufficiently severe or pervasive.

11

Workplace harassment that is so severe or pervasive that it alters the conditions of employment constitutes hostile work environment discrimination actionable under Title VII. *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986).

> [W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "[I]t is settled law that courts should not consider each incident of harassment in isolation. Rather a court must evaluate the sum total of abuse over time." *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 155 (3d Cir. 1999) (internal citations omitted); *see also Andrews v. City of Phila.*, 895 F.2d 1469, 1485 (3d Cir. 1990); *Jensen v. Potter*, 435 F.3d 444, 451-52 (3d Cir. 2006), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). With this standard in mind, the court will now examine the evidence offered by Plaintiff of severe or pervasive sex and race harassment at Capitol.

## 1. **Sex Discrimination**

A genuine issue of material fact exists as to whether Plaintiff was subjected to sexual harassment sufficiently severe or pervasive to constitute hostile environment sex discrimination under Title VII. Plaintiff has proffered evidence of a workplace permeated by vulgar language of sexual nature. In her deposition, Plaintiff alleged that her supervisor, Bill Long, used to make a sexual comment to her almost every night, often when he was alone with her. For instance, he once asked her what kind of panties she wore, and what color they were. On another

occasion he told her that was watching her while she did her work and told her "[y]our titties look so good.  I can't even hardly do my work from keeping an eye on you." (Tillison 61:6-9.)  Additionally, Long often looked at pornography on his office computer in full view of the third shift workers, and according to Tillison, once asked her to come into his office where he showed her a video of two naked women wresting.

Moreover, these statements and actions occurred in a workplace that by all accounts was permeated with vulgar and derogatory language of a sexual nature used both by Long and other Capitol employees.  According to Long, vulgar language "was all around.  It was in the garage, in the break room, pretty much everywhere." (Long Dep. 86:17-19.)  In his deposition, Long stated that the language used in the Capitol shop was too offensive to use at home in front of his wife and daughter. (Long Dep. 85.)  Skip Becker, the Vice President of Human Resources at Capitol, and the official tasked with investigating workplace discrimination under the company's sexual harassment policy, acknowledges that the work environment was worse in the shop and on the night shift than what was permitted in the office.  Taken together, the evidence proffered by Plaintiff is sufficient to raise a general issue of material fact as to both the severity and the pervasiveness of sexual harassment in her workplace.  Viewing the evidence proffered by Plaintiff in the light most favorable to her, a trier of fact could conclude that she was subjected to severe and pervasive sexual harassment in violation of Title VII.

_____

## 2.  **Race Discrimination**

Defendant also challenges the severity and pervasiveness of Plaintiff's allegations of race discrimination, arguing that the one incident of alleged race discrimination identified by Plaintiff is not sufficient to constitute a violation of Title VII.  In her brief in opposition to Defendant's motion, Plaintiff failed to respond to this argument.  Accordingly, Plaintiff has waived the issue.

As Defendant correctly points out, it is well-established that a single isolated incident of a disparaging remark is insufficient to constitute either severe or pervasive harassment.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Harris*, 510 U.S. at 20.  Here, Plaintiff identifies only a single incident of race discrimination.  According to Plaintiff, after she asked Long whether he liked black women, he responded that "if [he] could have every flavor of nationalities [he] would."  (Tillison Dep. 66:1-4.)  This lone remark, in response to Plaintiff's own inquiry, is insufficient to establish severe or pervasive race discrimination.  Accordingly, summary judgment will be granted to Defendant on Plaintiff's racial discrimination claims under both Title VII and the PHRA.

### B.    *Faragher/Ellerth* **Defense**

Defendant also argues that it is entitled to the affirmative defense recognized by the Supreme Court in *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), because Plaintiff unreasonably failed to utilize its non-discrimination policy.  In *Faragher* and *Ellerth*, decided the same day, the Supreme Court held that an affirmative defense to hostile environment discrimination is available where an employer can demonstrate two elements: (1) that "the employer exercised reasonable care to

14

prevent and correct promptly any sexually harassing behavior, and [2] that the plaintiff employee failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807.  A defendant bears the burden of proof on both elements. *Id.*  However, an employer cannot rely on this defense where the harassment results in an adverse tangible employment action, such as a constructive discharge. *Faragher*, 524 U.S. at 807; *Burlington*, 524 U.S. at 762-63; *see also Pa. State Police v. Suders*, 542 U.S. 129 (2004) (holding that a constructive discharge constitutes a tangible employment action).

"After the Supreme Court's *Faragher / Ellerth* decisions, employers must do more than merely take corrective action to remedy a hostile work environment situation.  Employers also have an affirmative duty to prevent sexual harassment by supervisors." *Weston*, 251 F.3d at 426.  The mere existence of an anti-discrimination policy does not establish that a defendant has met its burden for the first element of the defense. *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 118 (3d Cir. 1999) ("*Ellerth* and *Faragher* do not, as the defendants seem to assume, focus mechanically on the formal existence of a sexual harassment policy, allowing an absolute defense to a hostile work environment claim whenever the employer can point to an anti-harassment policy of some sort."); *see also EEOC. v. Smokin' Joe's Tobacco Shop, Inc.*, 2007 WL 1258132, at *7 (E.D. Pa. Apr. 27, 2007) (holding that dissemination of anti-discrimination policy in employee handbook is not a sufficient basis for granting summary judgment to defendant).

Defendant claims that Plaintiff unreasonably failed to utilize an effective sex discrimination policy which was in place at the time of the alleged

discrimination.  Plaintiff argues that the policy was ineffective and that Capitol discouraged her from utilizing it.  Additionally, Plaintiff argues that Defendant is not entitled to the *Faragher/Ellerth* defense because it took a tangible employment action against her by constructively discharging her.  These arguments will be addressed in turn.

There is a genuine issue of material fact as to whether Capitol acted reasonably to prevent harassment by implementing an effective non-discrimination policy.  Capitol took no affirmative steps to prevent sexual harassment by its managers.  It provided no formal sexual harassment or nondiscrimination training to its employees, because the company did not perceive a need for such training.

During Plaintiff's employment, Capitol had not one, but three separate policies addressing sexual harassment—the Sexual Harassment Policy, the Equal Employment Opportunity Policy, and the work rules for the shop.  However, these policies overlapped and contradicted one another in some important respects.  For instance, the Equal Employment Opportunity Policy and the work rules both direct employees to bring harassment or discrimination to the attention of the company, but do not require a complaint to be made to any particular member of management, nor do they specify that the complaint must be made to someone other than the accused harasser.  Instead, both policies simply state that an employee "may discuss the matter with any member of management, including the owners."  On the other hand, the Sexual Harassment Policy mandates that an employee "must bring [a complaint of sexual harassment] to the attention of the Vice President of Human Resources" unless that individual is the subject of the complaint, in which case Capitol's president must be notified.

16

Plaintiff has also offered evidence that these policies were not accessible to employees.  It is undisputed that both the Sexual Harassment and Equal Employment Opportunity policies were only briefly reviewed with Plaintiff on her first day of employment.  Thereafter the policies were stored in a locked file cabinet in Capitol's administrative office which was inaccessible during the third shift when Plaintiff was at work.  Moreover, in order to utilize the complaint procedure set forth in the Sexual Harassment Policy Plaintiff would have had to come in to Capitol's administrative office after her shift had ended in order to make a complaint to Skip Becker, Capitol's Vice President of Human Resources.  Furthermore, there is evidence that Plaintiff did not know who Capitol's Vice President of Human Resources was or how to reach him.  (Tillison Dep. 51.)

Moreover, a genuine dispute of material fact exists as to the second element of the affirmative defense—whether Plaintiff unreasonably failed to utilize any preventive or corrective opportunities provided by Capitol.  Plaintiff stated at her deposition that she understood that sexual harassment should be reported to management.  (*Id.* 33-34, 37.)  However, Plaintiff also alleges that when she complained about the harassment to Long, a member of Capitol's management, and threatened to report it to others, Long discouraged her from doing so, saying "if you go in there, they ain't going to do nothing but laugh at you.  They ain't going to do nothing if you go in there and tell them we're sexually harassing you, they ain't going to do nothing."  (Tillison Dep. 64:20-65:4.)  Becker stated in his deposition that he did not believe that Plaintiff's statement to Long was sufficient to constitute a complaint under Capitol's policies because Long was the alleged harasser.  (Becker Dep. 108.)  However, as noted above, Capitol's non-discrimination policies

were ambiguous on this point.  Viewing the facts in the light most favorable to Plaintiff, a trier of fact could determine that Plaintiff did not unreasonably fail to utilize Capitol's non-discrimination policies.

Because there is a genuine dispute of fact as to whether Capitol had an effective non-discrimination policy that Plaintiff unreasonably failed to utilize, Defendant is not entitled to summary judgment on the *Faragher / Ellerth* defense. Thus, it is unnecessary at this stage in the litigation to reach the issue of whether Plaintiff was constructively discharged from Capitol.

**IV.**      **Conclusion**

In accordance with the foregoing discussion, Defendants' motion for summary judgment is granted in part and denied in part.  An appropriate order will issue.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated:  July 8, 2008.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CARLA TILLISON,** | : | **CIVIL NO.1:CV-06-2004** |
| **Plaintiff,** | : | **JUDGE SYLVIA H. RAMBO** |
| **v.** | : | |
| **CAPITOL BUS COMPANY, d/b/a CAPITOL TRAILWAYS INC.,** | : | |
| **Defendant.** | : | |

## O R D E R

In accordance with the accompanying memorandum of law, **IT IS HEREBY ORDERED THAT**

    (1)    Defendant's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART** as follows:

        (a)    Summary judgment is **GRANTED** as to Plaintiff's race discrimination claims under Title VII and the PHRA; and

        (b)    Summary judgment is **DENIED** in all other respects.

    (2)    A new case management order will issue.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated: July 8, 2008.